IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs January 27, 2004

## STATE OF TENNESSEE v. ROBERT ALLEN CRAWFORD

**Direct Appeal from the Criminal Court for Washington County**
**No. 25661      Robert E. Cupp, Judge**

---

**No. E2003-00627-CCA-R3-CD**
**March 9, 2004**

---

The defendant was convicted by a Washington County Criminal Court jury of first degree felony murder in the perpetration of an aggravated burglary; criminally negligent homicide, a Class E felony; aggravated burglary, a Class C felony; aggravated assault, a Class C felony; and reckless endangerment, a Class E felony. The trial court merged the conviction for criminally negligent homicide with the conviction for first degree murder, and the defendant received concurrent sentences of life for the first degree murder conviction, four years for the aggravated burglary conviction, three years for the aggravated assault conviction, and one year for the reckless endangerment conviction. He raises two interrelated issues on appeal: whether the evidence was sufficient to support his felony murder conviction and whether the aggravated burglary count of the indictment was fatally defective for failing to name a victim for the underlying intended assault, thereby invalidating his convictions for aggravated burglary and first degree murder. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

A. Scott Pratt, Johnson City, Tennessee, for the appellant, Robert A. Crawford.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Steven R. Finney, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The record in this case establishes the following facts. On the afternoon of June 22, 1999, the defendant, Robert Allen Crawford, whose estranged girlfriend, Diana Hatley, had appeared in

court earlier that day on a domestic abuse charge against him, fired two shotgun blasts through the door of the trailer home that Hatley's father, Billy Ricker, shared with his longtime companion, Linda Leopold, and their disabled daughter, Georgia Ricker. At the time of the incident, Hatley, who was Ricker's daughter from a previous marriage, was also in the home. The defendant's first shot went through the doorknob. The second shot went through the door and into Ricker's abdomen, causing his death.

Unable to gain entry through the front door, the defendant broke a window, entered the house with his shotgun in hand, smashed furniture in the front room, and began beating Hatley and threatening to kill her, Leopold, and Georgia Ricker. Hatley fought back, struggling with the defendant over the gun and eventually managing to wrest it from his grasp and run out the front door. Upon seeing sheriff's deputies outside, the defendant fled through the back door and into a nearby field, where he was captured. He was subsequently indicted by the Washington County Grand Jury on one count of first degree premeditated murder, one count of first degree felony murder, one count of aggravated burglary, two counts of aggravated assault, and one count of felony reckless endangerment.

At the defendant's July 8-11, 2002, trial, Linda Leopold testified as follows. She lived at 143 L.C. McKee Road in Jonesborough, Tennessee, the location of the shooting. She and Billy Ricker had never married, but had lived together for thirty years and had a daughter, Georgia Ann Ricker, who was mentally and physically handicapped and confined to a wheelchair. Early on the morning of the shooting, the defendant came to Ricker's home and pushed his way into Hatley's bedroom. Ricker ordered him to leave, raising his voice, and the defendant complied. Ricker and Hatley then left to go to court on a domestic abuse charge that Hatley had filed against the defendant. The defendant returned to the house at approximately 1:15 p.m., at a time when he was supposed to have been in court and while Ricker and Hatley were still gone. The front door was locked, and Leopold was in the bathroom when she heard footsteps on the front porch. When she came out of the bathroom, she saw the defendant walking around the house. She then heard the sound of his footsteps on the back steps, followed by the sound of the unlocked back door sliding open. By the time she reached the kitchen, the defendant was already inside the home.

The defendant wanted to see Hatley and asked Leopold where she was. She told him Hatley had gone to court with her father to have papers drawn up to have the defendant leave her alone, because she was afraid of him. The defendant asked repeatedly if he could come in to return Hatley's clothes and became angry when Leopold told him to leave the clothes on the front porch. She asked the defendant to leave, and he backed onto the porch. Before leaving, however, he pulled a red shotgun shell out of his pocket and said, "Well, I got this for her. If I can't have her, nobody else can." Leopold testified she locked the back door after the defendant left, but did not call the police because she did not want to upset Georgia. She said she did not smell any alcohol on the defendant.

Approximately fifteen minutes after the defendant's departure, Ricker and Hatley returned to the house and Ricker immediately asked why Leopold had not answered the telephone during their

-2-

absence. She told him it had not rung, which led to their discovery that the phone lines had been cut at the box outside the house. In response to Ricker's telephone call from a neighbor's residence, a police officer came to the house and stayed approximately twenty minutes talking to them about the incident and inspecting the cut phone lines. Immediately after his departure, the entire family went back inside the house and, shortly thereafter, Hatley called out to her father that the defendant was coming on the porch with a shotgun. Leopold turned Georgia's wheelchair over to Hatley and begged her not to let the defendant hurt Georgia. Hatley took Georgia into a bedroom, and Leopold joined Ricker on the front porch of the trailer.

Leopold testified that when she and Ricker stepped outside, the defendant pointed his gun at them and told them he was going to shoot. She said Ricker yelled at the defendant to put his gun down, but the defendant kept coming. She and Ricker retreated inside, and she shut and locked the front door. However, she then heard banging at the bottom of the door, caused, she believed, by the defendant's kicking the door, and the door kept "popping" open despite her efforts to hold it shut. She yelled to Ricker that she was unable to hold the door, and he came behind her and reached to help hold it. The first shot went through the doorknob and burned her hand. Ricker pushed her aside, and the second shot struck him. He turned to her, said, "Linda, he shot me," and fell into her arms. Leopold said that, before he was shot, Ricker screamed at the defendant to put the gun down and that she yelled at the same time for him not to shoot. Because the door was thin, she was confident the defendant heard them yelling and knew that Ricker was behind the door.

Leopold testified she laid Ricker down in the hallway and went into the bathroom. She said Ricker's body blocked the front door and prevented the defendant from entering. Next, the defendant broke a window, reamed out the broken glass with his gun, stepped through the window, and "started busting up everything in the front room." However, as soon as he spotted Hatley in the kitchen, he raised his gun and went toward her. Hatley came forward to meet him, and the defendant beat her as she fought him for the gun. During the process, the defendant told Hatley she had made him kill her father and threatened to make her watch him kill Leopold and Georgia before he killed her as well. Leopold testified she ran out the front door, pulling Ricker's feet out of the way in order to get the door open, when she saw that the defendant, who was sitting in a chair in the kitchen, was distracted by Hatley attempting to persuade him to leave.

On cross-examination, Leopold acknowledged she had never heard any cross words between Ricker and the defendant prior to this incident, and the defendant had been at their home the evening before the shooting to retrieve his black pickup truck from Hatley. She believed, however, that the defendant intentionally killed Ricker because he was angry with him for trying to help Hatley get away from the defendant.

Officer Vernon Story of the Washington County Sheriff's Department testified he responded to the 3:00 p.m. report of the vandalized phone lines as well as the subsequent report of the shooting. During his investigation of the vandalism call, Leopold identified the defendant as having been at the house earlier and told him of the defendant's threat involving the shotgun shell. Officer Story testified he had gone no more than four or five miles from the home when he received the report of

the shooting. When he returned, he saw broken glass and a hole in the trailer's front door but did not see anyone. After identifying himself and twice calling out to Leopold on his loudspeaker, he stepped out of his patrol car. At that point, Leopold came running out the front door, yelling, "He shot my husband. He shot my babies." Officer Story said he directed Leopold to her neighbor's house and then approached the trailer with Sergeant Wiseman, who arrived at the scene after him. As they approached, Hatley came out the front door carrying a shotgun and yelling, "He killed my daddy. He's trying to kill me. He's trying to kill me." Story directed her to put the gun down and join her mother across the street.

Officer Story testified Hatley had gone approximately twenty feet when the defendant came out on the porch after her. The defendant stopped when he saw the officers but ignored their orders to get on his knees with his hands up. The defendant then went back inside the trailer and, by the time the officers got inside, he was already at the kitchen door. They once again ordered him to get on his knees and raise his hands, but instead of complying, he went through the screen door onto the porch, leapt over the porch rail, landed on the ground six to eight feet below, ran to a field, dived over a barbed wire fence, rolled, got up on his feet, and kept going. Officer Story testified the shotgun he recovered from the scene was loaded, cocked, and ready to fire. On cross-examination, Officer Story testified he did not get the impression that the defendant was trying to commit "suicide by cop."

The defendant was captured by Officer David Chambers of the Washington County Sheriff's Department after a chase through the field and a struggle in which the defendant repeatedly told the officer to shoot him. Officer Chambers testified the defendant was not armed, but he found a 16-gauge shotgun shell in the defendant's front pocket when he searched him after his arrest. He testified on cross-examination that he smelled a strong odor of alcohol on the defendant.

Charles Clifford Ferguson, a neighbor who made the 9-1-1 call to report the shooting, testified he was working in his shop when he heard "a noise like a gun blast." He said he heard a second blast as he was running out of his shop and then saw someone with a shotgun breaking a window at Ricker's trailer. Ferguson testified there was a vacant house for sale located to the left of the Ricker residence, where he saw a black pickup truck parked after the shooting. He found a cup and a bottle in a fence row near the vacant home, which he reported to Investigator Shawn Judy, who asked him to accompany him as he inspected the area. Ferguson testified a bottle of Jack Daniels was located in a "mashed down" area overgrown with vegetation, "like a little cave area," in the grass beside the fence row, where it appeared someone had been sitting. Other items found in the same area included cigarette butts and a cigarette lighter. Ferguson said "kind of a little path" led from the area up to the road and a barbed wire fence across from the vacant house where the black truck was parked. Cinder blocks, under which Ferguson found green grass, had been stacked "to make steps to go across the barbed wire fence."

Sergeant Shawn Judy of the Washington County Sheriff's Department identified a videotape he had made of the scene, which was subsequently admitted as an exhibit and published to the jury. He also identified the 16-gauge shotgun recovered from the scene with one live round, as well as

photographs of items found in the defendant's truck after the shooting. He testified several 12-gauge shotgun shells, which would not fit the gun, were found in the cab of the defendant's truck, along with a 16-gauge, buckshot weight shotgun shell box, which should have come with five rounds.

Washington County Sheriff's Department Officer Mike Adams, formerly an investigator with the department, testified he and Investigator Hull took two statements from the defendant, the first at 7:35 p.m. on June 22, 1999, which they quickly terminated because the defendant informed them he had been drinking alcohol, and the second from 1:20 to 3:18 p.m. the following day. The defendant's second statement, which Officer Adams read aloud to the jury and which was subsequently admitted as an exhibit to his testimony, reads as follows:

> On 6/22/99 I went to Billy Ricker's house on L. C. McKee Road. It was about 3 p.m. I backed my truck up a driveway that is just before Billy's house. It is for sale. I sat in the driveway for awhile and drank Jack Daniels. I got out of the truck. I had a shotgun and shells that I took with me. I went across the road into the field that is next to Billy's house. I went thru the field and crossed the fence. I took some wire pliers and cut the phone lines. I went around the front and went up on the porch. I knocked on the door and told them I wanted to talk to Diana. They would not let me in. I tried to open the door but it was locked. I shot the door. I tried to shoot the door handle. I unloaded the gun and put in a new shell, out of my front pocket. I busted the window out and went in. Billy grabbed the shotgun and we fell over the table. We fought in the living room and kitchen. Billy got the gun away and threw it. Diana picked it up and said, "I'll kill you – you son of a bitch." I threw her a new shell, because it had went off when Billy and I was fighting. Diana got the shell, loaded the gun and fired. Billy went down. Linda hollered, "You all have killed Billy." I don't remember what all happened after that. I remember trying to get out. I don't remember getting out and I don't remember any law. They must not have had their lights on. I would remember that. I don't remember leaving the trailer. I remember my eyes burning and remember someone saying, "Why did you run?"
>
> The shotgun was Billy's but I had it in my truck for a while. I had stopped yesterday at the gun shop on 11-E next to Bottoms Up, just outside of Jonesborough. I stopped there on my way to Billy's, and bought the shells. There were some shells in my truck but those are 12 gauge. I had to buy a box of 16 gauge.

I didn't mean to shoot Billy. I went to Diana's to talk to her.
I took the shotgun to Billy's – not to hurt anyone but to hurt myself.
If I was going to hurt anyone, Diana would have been the first one.

Officer Adams testified the defendant informed them at the beginning of the interview process that he had a hearing deficit, and they consequently spoke loudly in order for the defendant to understand them. He acknowledged on cross-examination the defendant smelled of alcohol when he began his first statement, and the reason they terminated the interview was because they feared he was intoxicated.

Kimberly White, who was working at Crowder's Gun and Vac in June 1999, testified she sold the defendant a box of Winchester 16-gauge, buckshot weight shotgun shells at 1:15 p.m. sometime around June 22. She remembered the exact time, but not the exact date. White said the shells she sold the defendant were the only box in the store and the only box of that kind she had ever sold. When the defendant came into the store, he told her he had been everywhere looking for those shells.

Diana Hatley testified she had dated the defendant for about six months at the time of the shooting. Their relationship had been rocky, and the night before the shooting her father had told the defendant that he was not welcome at the house and that he should leave her alone. The defendant telephoned on the morning of the shooting, but they did not answer the phone. At about 10:00 that morning, the defendant came to the house, pushed his way past her father, came into her bedroom, and shut the door. Her father and Leopold followed and asked him to leave, and although the defendant cursed, he left the house at that time.

Hatley testified the defendant failed to show up for his scheduled court date on the domestic abuse charge against him. When she and her father arrived home, they learned of his visit with Leopold during their absence and discovered the cut phone lines. After the officer who responded to their report of the vandalized phone lines had left, she saw the defendant walking through their yard with a gun. She pushed Georgia into a bedroom and went to the kitchen. From there, she saw her father, who had gone out on the porch and was pleading with the defendant to put the gun down, being backed up by the defendant with the gun. Next, her father came in the house and told Leopold to lock the door. At the same time, the defendant was pushing against the door. Leopold locked the door, her father pushed Leopold to the side, and Leopold called out to her to go back to Georgia. Hatley said she had turned to go to the bedroom when she heard a boom and her father grunt and say, "Oh, you SOB." When she turned around, she saw her father fall.

Hatley testified the defendant tried to get through the door, but it was apparently jammed, so he came through a window. She said she grabbed the gun when he got close to the couch and held on with all her strength, refusing to let go in spite of his hitting and biting her. They fought for the gun in the den and the kitchen. During the struggle, the defendant told her that she had made him kill her father and said, "Linda has to die, Georgia Ann has to die, and then you're going to die." Hatley said she managed to pull the gun from the defendant, ran with it to the bathroom, banged on

-6-

the door, and called to Leopold that she had the gun. However, the defendant ran up behind her, grabbed her by the hair, and said, "Not for long, b-i-t-c-h." During that time, her father was struggling to get to his feet to assist her and saying, "If you don't get me up, I'm going to bleed to death." The defendant, however, stomped on the side of her father's head until he stopped trying to get up. Hatley testified she and the defendant then began fighting over the gun again and struggled so hard that both had to sit and catch their breath. When she saw the defendant glance away, she managed to get the gun from him and ran out the door. On cross-examination, Hatley denied she had an alcohol or drug problem.

The State's final witness was Dr. Gretel Harlan, the forensic pathologist who performed the autopsy on Ricker's body, who testified Ricker bled to death from a shotgun wound to his abdomen and pelvis. She said the wound contained insulation material that appeared identical to fibers from the trailer's front door.

Following the trial court's denial of his motion for judgment of acquittal on the first degree murder and aggravated burglary counts of the indictment, the defendant called as a witness a former girlfriend, Donna Sims, who testified she had known the defendant fourteen or fifteen years, that he was a good-hearted person, and she had never known him to be violent. She also said the defendant had difficulty hearing. On cross-examination, she testified that knowledge of the defendant's prior convictions for assault would not change her opinion of his character.

The defendant's mother, Novella Black, testified the defendant had learning disabilities and was hard of hearing. She said the defendant's grandfather and father had both committed suicide, and the defendant and his half-brother had discovered their father's body. Black testified the defendant was depressed and talked about committing suicide during the period of time preceding the shooting. She said the defendant knew Ricker from having attended the same auctions and estate sales and always got along well with him. She did not believe the defendant had intended to kill Ricker.

The defendant testified he had had learning problems all of his life and had difficulty hearing. He said he had known Ricker eight years and had always gotten along well with him. He stated that he met Hatley in 1998 and fell in love with her within the first week of their acquaintance. He said Hatley drank every day, "took quite a few pills," and occasionally smoked marijuana. Although they got along well when sober, they argued whenever they drank.

On the night before the shooting, the defendant was riding with his mother in her car when he saw Hatley speed past him driving his black Ford pickup truck. The defendant said he was concerned because Hatley was driving drunk in his truck without insurance. After following Hatley for awhile and then losing her, he and his mother drove to Ricker's house, where he retrieved his truck and had a conversation with both Ricker and Hatley. The defendant testified Ricker told him Hatley was an alcoholic and he should leave her alone because she would always cause him problems. The defendant said, however, that he was not ready to give Hatley up.

The defendant testified he had a job interview the morning of the shooting at a place Hatley had put in an application as well. He said Hatley told him during their conversation the previous evening that she wanted to accompany him on his interview. However, when he stopped by Ricker's home that morning to pick her up, "she was totally a different person" and told him she no longer wanted to be with him. The defendant said he was so hurt and depressed that he went home and started drinking, ignoring his job interview. At about 10:45 a.m., he left home and went to the courthouse in Johnson City, where a woman told him he was not supposed to be in court until 1:30 p.m. He got back in his truck "and started drinking and went down on the river."

The defendant testified he did not remember buying the shotgun shells. He said he had no intention of killing anyone, and there was no significance to the number of shells the box contained. He remembered backing his truck into the driveway of the vacant home but only "bits and pieces" of what else occurred. He did not remember going to the house and talking to Leopold, cutting the telephone wires, or later walking onto the porch of the residence and confronting Ricker and Leopold with the shotgun. He also did not remember firing the shotgun through the door but said it was possible he had. He was confident, however, that he would not have done so in an attempt to get inside the house. The defendant testified he could have entered through the back door because he knew from previous visits to the home that the lock on that door was broken and the door could be secured only by placing a broom handle in the trough. He offered the following explanation for firing his shotgun at the front door:

> If I'd have shot – the only thing that I could think of would be the reason I'd have shot the door was just to get Diana to come out to talk to me to where we could see if we could work our relationship out, maybe to kill myself in front of her, to hurt her like she had hurt me, to – far as I know that was all I could know the reason I could have fired the shotgun.

The defendant said he had no memory of breaking the window with the shotgun, and the only thing he remembered while inside the house was sitting at the kitchen table and talking with Hatley.

The defendant reiterated on cross-examination that he had no memory of having shot the door. He also testified he did not remember Ricker screaming at him to put the gun down but said if Ricker had, he might not have heard Ricker because of his hearing deficit. He denied it was possible to see through the glass window in the door that someone was standing behind the door.

## ANALYSIS

The defendant raises two interrelated issues on appeal: whether the evidence was sufficient to sustain his conviction for first degree felony murder and whether the aggravated burglary count of his indictment was fatally defective. He contends the evidence was insufficient to sustain his felony murder conviction because the State failed to prove the essential elements of intent and victim, and the indictment was fatally defective for failing to name the victim of the intended

underlying assault upon which the burglary conviction was based. The State argues it proved each element of the offense and that the evidence was more than sufficient for a rational jury to find the defendant guilty of first degree felony murder in the perpetration of a burglary beyond a reasonable doubt. The State further argues that the aggravated burglary count of the indictment satisfied constitutional and statutory notice requirements by providing notice to the defendant of the offense with which he was charged, and that the specific allegations of the separate assault charge were not required to support the charge of aggravated burglary.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Count one of the indictment charged the defendant with the first degree felony murder of Ricker committed in the perpetration of an aggravated burglary. At the time the events in this case transpired, first degree felony murder was defined as the killing of another "in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or airline piracy[.]" Tenn. Code Ann. § 39-13-202(a)(2) (1997).

The requisite intent for a first degree felony murder conviction is the intent to commit the underlying felony, which in this case was the aggravated burglary. In the light most favorable to the State, the proof in this case showed that the defendant, upset and angry at Hatley for ending their relationship and angry at her family for their role in supporting her, purchased shells for a 16-gauge shotgun, went to her father's home where he knew she was staying, and threatened Ricker and Leopold with the shotgun as they stood on the front porch attempting to prevent his entry. When Ricker and Leopold retreated inside and locked the door, the defendant first kicked at the door in an effort to gain entry and then fired two shotgun blasts through it, one going through the lock and the other striking and killing Ricker. Unable to enter through the front door, which was blocked by Ricker's body, the defendant broke out a window and entered the home, where he engaged in a struggle with Hatley over the gun and threatened to kill her, Leopold, and Georgia Ricker. We agree with the State that this evidence overwhelmingly supports the jury's verdict finding the defendant guilty of first degree felony murder in the perpetration of an aggravated burglary.

The defendant also contends the aggravated burglary count of his indictment is defective for failing to specify the victim he intended to assault. He argues this omission required the jury to presume who the intended victim was, thereby impermissibly shifting the burden of proof and rendering his convictions for aggravated burglary and first degree felony murder invalid. We respectfully disagree.

As an initial matter, we note that this issue would ordinarily be waived due to the defendant's failure to raise it in a pretrial motion or in his motion for a new trial. See Tenn. R. Crim. P. 12(b)(2), (f); Tenn. R. App. P. 3(e). Nonetheless, the defendant's counsel, recognizing that the issue would ordinarily be waived, has respectfully requested that we reach the merits of the issue in the interest of justice, and we have chosen to do so. See Tenn. R. Crim. P. 52(b). Regardless, we conclude the issue is without merit. An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Count three of the indictment alleged that on or about June 22, 1999, in Washington County, Tennessee, the defendant committed the offense of aggravated burglary "by knowingly entering a habitation, the property of Billy Ricker, without the effective consent of the owner(s) and with the intent to commit an assault; a Class C felony in violation of Section 39-14-403, Tennessee Code Annotated, and against the peace and dignity of the State of Tennessee." It was not necessary for the aggravated burglary count of the indictment to state the intended victim of the underlying assault in order to put the defendant sufficiently on notice of the charge for which he would be required to defend himself. See, e.g., James E. Kenner v. State, No. 01C01-9709-CR-00424, 1999 WL 333097, at *8 (Tenn. Crim. App. May 26, 1999) (stating indictment alleged petitioner "'did enter the habitation of [the victims] with the intent to commit theft in violation of Tenn. Code Ann. § 39-14-403, and against the peace and dignity of the State of Tennessee'"), perm. to appeal denied (Tenn. Oct. 4, 1999); State v. Derek Denton, No. 02C01-9409-CR-00186, 1996 WL 432338, at *12 (Tenn. Crim. App. Aug. 2, 1996) (noting aggravated burglary indictment charged defendant with entering home without consent of owner "and with the intent to commit aggravated assault").

## CONCLUSION

After a thorough review of the record, we conclude the evidence was sufficient to sustain the defendant's conviction for first degree felony murder and that the aggravated burglary count of the indictment was not fatally defective for failing to name the victim against whom the defendant intended his assault.  Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE